Carlos DIAZ, Petitioner,

v.

Charles SCULLY, Respondent.

Toribio CINTRON, Petitioner,

v.

Charles SCULLY, Respondent.

Nos. 85 Civ. 3997 (VLB), 85 Civ. 6048 (VLB).

United States District Court, S.D. New York.

July 15, 1986.

Toribio Cintron, pro se.

Carlos Diaz, pro se.

Adina Kling, Asst. Atty. Gen., New York City, for Charles Scully.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

Petitioners Diaz and Cintron each seek a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to set aside judgments of the New York State Supreme Court, which convicted them of kidnapping in the first degree and robbery in the first degree on March 21, 1980.[1] Petitioners, along with another defendant, Anibal Caballero,[2] were sentenced to an indeterminate term of 15

years to life on the kidnapping count and seven years on the robbery count.

Petitioners appealed their convictions to the New York Supreme Court, Appellate Division, First Department. By orders dated June 3, 1982 the judgments against the petitioners were affirmed without decision. Petitioners then sought leave to appeal their convictions to the New York Court of Appeals. By orders dated July 8, 1982 and July 28, 1982, leave was denied.

Each petitioner now asserts two grounds for habeas corpus relief: (1) the trial judge diluted the reasonable doubt standard by instructing the jury that "the People do not have to prove as to each defendant, each of the elements of the crime, if you find that they were intentionally aiding each other." Transcript (hereinafter "T.") at 2199; (2) the prosecutor abused his peremptory challenges by eliminating Blacks and particularly Black women from the jury.

Because the bases in each petition for relief sought are identical and stem from the same set of operative facts at trial, I consolidate the two petitions, and treat them together.

### I.

Respondent claims that this court has no jurisdiction to hear the petitions because the petitioners have failed to exhaust their state remedies. He contends that petitioners never alerted the state court to the federal constitutional nature of the jury charge claim and therefore the petitions must be dismissed, or alternatively, petitioners must delete the unexhausted claim.

■ If a state prisoner has not exhausted his state court remedies, dismissal of the petition by the federal court is required. *Picard v. Connor*, 404 U.S. 270, 276, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); *Wilson v. Fogg*, 571 F.2d 91, 92 (2d Cir.1978). A petition which asserts both

---

1. Petitioners were convicted at a second trial on these counts. Their first trial had been declared a mistrial when the jury was unable to reach a verdict. Petitioners contend that the jury split

six to six at the time a mistrial was declared, with six Black women jurors favoring acquittal.

2. Caballero is not a party to this application for habeas corpus relief.

exhausted and unexhausted claims must be dismissed until the petitioner returns to state court to litigate his unexhausted claims, or amends his petition to delete them. *Rose v. Lundy,* 455 U.S. 509, 520–21, 102 S.Ct. 1198, 1204–05, 71 L.Ed.2d 379 (1982).

In order to have exhausted state remedies as to a particular claim, a petitioner must have presented the claim in state court in a manner likely to have alerted the court to the federal nature of the claim. *Daye v. Attorney General of the State of New York,* 696 F.2d 186, 192 (2d Cir.1982), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). "A defendant may, however, fairly present the substance of a federal constitutional claim to the state court without citing 'book and verse on the federal constitution.'" *Daye,* 696 F.2d at 192 *(citations omitted).* "[T]he state court will be alerted to the constitutional nature of a claim if the defendant has claimed the deprivation of a particular right specifically protected by the Constitution." *Id.* at 193.

█ In the trial of these petitioners, petitioners excepted to the contested portion of the charge. T. 2232–33. In his appellate brief, petitioner Diaz raised the question of dilution of the reasonable doubt standard by the contested portion of the charge. *See* Appellate Division Brief of Defendant-Appellant Diaz at 53. This constituted adequate notice to the Appellate Division of the federal constitutional nature of the jury charge claim. Thus petitioner Diaz has exhausted his state court remedies and I have jurisdiction to address the petition on the merits. While it is less clear that petitioner Cintron raised this issue before the Appellate Division, *see* Appellate Division Brief of Defendant-Appellant Cintron at 36–38, judicial economy suggests that I impute Diaz's exhaustion to Cintron.

## II.

█ In their first claim for relief, petitioners argue that their due process rights were violated through dilution of the reasonable doubt standard by the trial court's instruction to the jury that "the People do not have to prove as to each defendant, each of the elements of the crime, if you find that they were intentionally aiding each other." T. 2199.

It is a fundamental principle of American criminal law that in order that a defendant be convicted on any charge, the prosecution must prove beyond a reasonable doubt, as to that defendant, each element of the crime charged. Where, however, under New York law a given defendant intentionally aids another person to commit a crime, he is guilty of the crime when he acts "with the mental culpability required for the commission thereof":

> When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.

New York Penal Law § 20.00.

In such situations the elements of the crime must be proven; it is not necessary that the prosecutor establish that the actor with respect to those elements was the defendant, so long as all of the elements are established beyond a reasonable doubt as to some other actor or actors, and it is further established beyond a reasonable doubt that the defendant, acting with the "mental culpability" required for the commission of the crime, intentionally aided the actor.

It was in the course of the trial judge's explication of Penal Law § 20 that the challenged sentence, underlined below, occurred:

> Now I have mentioned throughout these charges, reference to the defendant or one whom he intentionally aided.

> Under the law of the State of New York and members of the jury, a person is criminally responsible for an offense not only when he directly commits it, but when he intentionally aids in its commission.

This basic principle is stated in our law and reads as follows:

"When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct, when, acting with the mental culpability required for the commission thereof—and I'll explain that term—he solicits, requests, demands, importunes or intentionally aids such person to engage in such conduct."

Now again, you may recall, as I said, there was reference to a fourth person, and under the law, in any prosecution for an offense in which the criminal liability of a defendant is based upon the conduct of another person, if you find that it's based on the conduct of this fourth person, it's no defense that such person is not being prosecuted for this conduct in question. It has nothing to do with the facts before you.

Now I said, as I read the statute, that a person engages in conduct which constitutes an offense, in this case, either kidnapping or robbery, another person is criminally liable for such conduct when acting with the mental culpability required for the commission thereof, he intentionally aids such person.

What do I mean by mental culpability? In the case of the crime of kidnapping, it's the intent to restrain Colon.

If a person intentionally aids another, with the intent to restrain him, with the intent to compel Victor Cruz to pay ransom, with the knowledge that the acts were unlawful, those are the mental— what we call mental culpability, same person, same intent, same knowledge.

In the case of the robbery charges, it's the intent to deprive another. When a jury finds, beyond a reasonable doubt, if a jury finds, beyond a reasonable doubt, that two or more persons acting together, pursuant to this common scheme, participated in a kidnapping, each is guilty of the crime under the law of this state. That is, the aider is as guilty as the actual abducter.

Similarly, as to robbery charges, it's immaterial as to who did what, as long as one was intentionally aiding another and as long as all the elements of the crime have been proven as to one or more of those participants.

Under this law, the guilt of the defendant may be established without proof that a defendant did each and every act constituted in the crime charged.

*In other words, the People do not have to prove as to each defendant, each of the elements of the crime, if you find that they were intentionally aiding each other.*

Let me give you a hypothetical. Suppose you had a case in which somebody went in, held up a liquor store and shot somebody. There are three or four people involved. One person went in with a gun, another person went to the cash box and took out the money, another person shot somebody and me [sic], another person was standing was standing [sic] outside as a lookout. If the People were to prove all the facts and circumstances of that case and all the elements of that crime, it would be immaterial that one did one thing and one did another. All four would be equally guilty of that crime, but, of course, participation is intentional, if it's done voluntarily and purposely, and with a specific intent to do some act that the law requires.

A person who intentionally aids another, must have intended to participate in the kidnapping, must have intended to participate in the robbery, because intentionally aiding another to commit a crime constitutes participation, but the degree or extent, I repeat again, to which the defendant intentionally participates in the commission of the crime, is totally immaterial.

If the prosecution have [sic] proven, beyond a reasonable doubt, two or more persons acted together as partners, so to speak, in the commission of a crime charged, the law does not stop to portion the percentage of guilt that may attach to each of them.

The defendant's participation in the crime charged, must, of course,—the requisite mental culpability, the requisite intent or the requisite knowledge, must be established, beyond a reasonable doubt, but you are not required to measure the amount of aid or the amount of assistance intentionally given by the parties to the criminal venture.

You don't have to differentiate between those who are principally concerned in the commission of the crime, and those whose activities are less important. It's like a play. A play consists of actors. Some have—are called principals; others may just walk across the stage for two minutes. They are all players.

Again, you do not need to differentiate between those who are principally concerned in the commission of the crime and those whose activities are less important. You are never called upon to decide that this one is 71 per cent guilty and that one is 29 per cent guilty.

The law of the state, members of the jury, is that a person who intentionally aids in the commission of a crime, is, himself, guilty of that very crime, provided the prosecution establishes such fact, beyond a reasonable doubt.

T. 2196–2201.

"It is well-established that the single sentence upon which petitioner[s] rel[y] should not be considered in isolation but rather in the context of the charge as a whole." *Fratarcangelo v. Smith*, 792 F.2d 40, 43 (2d Cir.1986) *citing Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985). Taken out of the context of the entire charge, and out of the context of aiding and abetting or "intentionally aiding" then being discussed, perhaps some legitimate question could be raised with respect to the challenged sentence. Its setting, however, was a charge which could stand as a model of completeness, of even-handedness, and of fairness to the defendants on trial.[3] The discussion of "intentionally aiding" followed a detailed analysis and explanation of all of the elements of each of the crimes charged, with constant iteration and reiteration with respect to the state's burden to establish, beyond a reasonable doubt, as to each defendant, every element as to any given crime if the defendant was to be found guilty of that crime.

In the context of the entire charge, and in the particular context of the discussion of "intentionally aiding", the challenged sentence did not constitute error. If it was error, the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 25, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Klein v. Harris*, 667 F.2d 274, 290 (2d Cir.1981).

Petitioners' applications for habeas relief are denied as to their first claim.

### III.

Petitioners' second claim is that the State used its peremptory challenges in an unconstitutionally discriminatory manner. Specifically, petitioners contend that at their second trial the prosecutor used a total of 17 peremptory challenges, 13 of which were used to exclude all of the potential Black women jurors and one of which was used to exclude a Black man

---

**3.** For example, the judge charged the jury:

You are trying three separate cases. Actually, you may be trying as much as six or nine cases because each count of the indictment against each of the defendants charges a separate crime against the individual named, and, therefore, as to each offense alleged as the applicable evidence, it should be considered separately as to each defendant and as to each count.... The fact that you may find one of the accused guilty or not guilty on any count or all counts, should not influence your verdict with respect to the other defendants or with respect to the other counts, unless, of course, all the evidence points in the same direction.

T. 2167–68.

Thereafter, the judge advised the jury to "[n]ever lose sight of the fact we have three defendants on trial, and you are going to be required to bring in a verdict as to each count, separately, as to each defendant." T. 2176. Finally, he reminded the jury that it "must separately determine the evidence as to each of these defendants and bring in a separate verdict as to each of them." T. 2185.

from the venire. They further contend that the final jury panel was comprised of only two Blacks: the third and fourth alternates, each of whom was dismissed before deliberation. *Id.*

In support of these contentions, petitioners submit a list of the names and race of the 17 potential jurors who were eliminated by the prosecution. This list was attached to petitioner Cintron's state appellate brief and was allegedly taken from the records of his attorney at trial.

There appear to be no minutes of the voir dire of jurors. *See* Affidavit of Anne Bogier, ¶ 5. However, relying on state appellate briefs, the state trial transcript, and the petitioners' motion to vacate the judgment, respondent argues that the petitioners have failed to make a showing to support their contentions. Specifically, respondent claims that the jury was composed of seven Whites, three Blacks, and two Hispanics, in addition to the two Black alternates. *See* Respondent's Brief at 15–16, citing State's Appellate Brief at 60. Respondent also cites the trial court's determination that the jury panel was composed of men and women of all races. *See* T. 3001.

Petitioners' second claim, then, is that the prosecution used 14 of its 17 peremptory challenges to eliminate potential Black jurors, and more particularly Black women jurors, on the basis of race in violation of *McCray v. Abrams,* 750 F.2d 1113 (2d Cir. 1984), *reh'g en banc denied,* 756 F.2d 277 (2d Cir.1985), *petition for cert. filed,* —— U.S. ——, 105 S. Ct. 2318, 85 L.Ed.2d 837 (1985) *cert. granted,* —— U.S. ——, 106 S.Ct. 3289, 92 L.Ed.2d 105 (1986) (judgment vacated and case remanded for further consideration in light of *Allen v. Hardy,* 477 U.S. ——, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), and *Batson v. Kentucky,* 476 U.S. ——, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)), and the Sixth Amendment to the United States Constitution.

Until recently, in cases in which claims were brought charging the exclusion of potential jurors on the basis of race, federal courts were governed by the Supreme Court decision in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). In *Swain,* the Supreme Court ruled that it was a violation of the Equal Protection Clause of the 14th Amendment for a state "consistently and systematically" to exercise its peremptory challenges in order to "prevent any and all" Blacks from serving on jury panels. 380 U.S. at 223, 85 S.Ct. at 837. However, the court also stated: " ... we cannot hold that the striking of Negroes *in a particular case* is a denial of equal protection of the laws." *Id.* at 221, 85 S.Ct. at 836 (*emphasis added*). The Court recognized a presumption in all cases that the state exercised its peremptory challenges in a manner intended to obtain a fair and impartial jury. To overcome this presumption a defendant would have to show that the state had a consistent practice of eliminating Blacks from juries in criminal trials. In other words, the equal protection violation was the denial of the right of Blacks to serve on juries in criminal trials generally, not the elimination of Blacks in a particular trial.

In *McCray,* the Second Circuit took the unusual step of directly rejecting the basic premise of the unanimous Supreme Court ruling in *Swain.* It based its decision on the Sixth Amendment, rather than on the Equal Protection Clause as the *Swain* court had done.[4]

> The *Swain* Court found it permissible for a prosecutor to eliminate all blacks in any given case simply because they are blacks, because the 'presumption ... must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury....' *Id.* at 222, 85 S.Ct. at 837. The implication of this presumption, however, is that in any given case before the court, whites can be fair and impartial, whereas blacks, simply because they are blacks, cannot.... [I]t is fallacious to assume that all persons sharing an attribute of skin color, or of

---

**4.** *Swain* was decided three years before *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), which made the Sixth Amendment applicable to the states.

general or ethnic origin, etc., will *ipso facto* be partial to others sharing that attribute.

*Id.* at 1121. Accordingly, the Second Circuit held:

... the Sixth Amendment's guarantee of trial by an impartial jury allows the prosecution to exercise its peremptory challenges to excuse jurors to whom, on the basis of their personal history or behavior, some bias may be imputed; but it forbids the exercise of such challenges to excuse jurors solely on the basis of their racial affiliation.

*Id.* at 1131. It then established the test to be applied when courts are faced with a claim of discriminatory use of peremptory challenges:

█n order to establish a prima facie violation of his right to the possibility of a fair cross section in the petit jury, the defendant must show that in his case, (1) the group alleged to be excluded is a cognizable group in the community, and (2) there is a substantial likelihood that the challenges leading to this exclusion have been made on the basis of the individual venirepersons' group affiliation rather than because of any indication of a possible inability to decide the case on the basis of the evidence presented.

If the defendant establishes such a prima facie case, " ' "the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." ' " [*citations omitted*]

In order to rebut the defendant's showing, the prosecutor need not show a reason rising to the level of cause. There are any number of bases on which a party may believe, not unreasonably, that a prospective juror may have some slight bias that would not support a challenge for cause but that would make excusing him or her desirable. Such reasons, if they appear to be genuine, should be accepted by the court, which will bear the responsibility of assessing the genuineness of the prosecutor's response and of being alert to reasons that are pretextual. If the court determines that the prosecution's presentation is inadequate to rebut the defendant's proof, the court should declare a mistrial and a new jury should be selected from a new panel.

*Id.* at 1131–32 (*citations omitted*).

The *McCray* court ruled that even if a petitioner is able to establish a prima facie case of discriminatory use of peremptory challenges and the prosecution is not successful in rebutting it in its papers, "principles of federalism and comity" suggest that an evidentiary hearing be held "giving the State every opportunity to respond to the petitioner's allegations" before a writ of habeas corpus is granted. *Id.* at 1134.[5]

This year the Supreme Court itself reconsidered the *Swain* decision. In *Batson v. Kentucky,* — U.S. —, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the court in a 7 to 2 opinion by Justice Powell expressly rejected *Swain's* "evidentiary formulation as inconsistent with standards that have been developed since *Swain* for assessing a prima facie case under the Equal Protection Clause." *Id.* 106 S.Ct. at 1721. Rather, the Court ruled that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 1722–1723.

The *Batson* test for establishing the unconstitutional use of peremptory challenges

---

**5.** Since the Second Circuit rendered its decision in *McCray,* there are only two reported decisions by courts in this district which have considered its ramifications. In *Roman v. Abrams,* 608 F.Supp. 629 (S.D.N.Y.1985), a decision now on appeal, Judge Brieant granted a habeas petition on the basis of *McCray.* He found that the petitioner, who had been convicted in 1981, had established a prima facie case that peremptory challenges had been exercised by the prosecutor deliberately to exclude potential white jurors solely because of their race. In a case involving the co-defendant of the petitioner in Judge Brieant's case, *Schreiber v. Salamack,* 619 F.Supp. 1433 (S.D.N.Y.1985), Judge Goettel denied the petition.

is quite similar to the *McCray* test, except that it is predicated on the Equal Protection Clause while the analysis in *McCray* is based on the Sixth Amendment. First, a petitioner must establish a three-part prima facie case of discrimination:

> To establish such a case, the defendant first must show that he is a member of a cognizable racial group, *Castaneda v. Partida, supra,* 430 U.S. [482], at 494, 97 S.Ct. [1272], at 1280 [51 L.Ed.2d 498 (1977)], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate. *Avery v. Georgia, supra,* [345 U.S. 559,] at 562, [73 S.Ct. 891, at 892, 97 L.Ed.2d 1244 (1953)]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empanelling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

*Id.* at 1723. If the petitioner is able to establish these three elements, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Id.* The court then sets forth several limitations on the states in their rebuttal evidence, most significantly that the prosecutor "may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race." *Id. (citations omitted).*

Thus whereas in *Swain* the Supreme Court refused to hold that striking of Blacks from a jury in a particular case constituted a denial of equal protection, under *Batson* it may constitute such a denial.

## IV.

*McCray* and *Batson* both were handed down well after petitioners were sentenced and their appeals decided. Petitioners Diaz and Cintron were both convicted on March 21, 1980 and exhausted their state appeals by the end of July, 1982. The Second Circuit rendered its decision in *McCray* in December, 1984, and the Supreme Court's ruling in *Batson* is only a few months old.

I may not consider the substantive application to their trial of either *Batson* or *McCray* principles unless the retroactive application of those cases is permissible. I turn to that question. The precise issue is whether the *Batson* or *McCray* rulings are applicable to a federal collateral attack upon a state conviction, with respect to which all appeals were exhausted prior to the *Batson* and *McCray* rulings.

In *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the Supreme Court for the first time "declined to apply a new doctrine respecting one of the provisions of the Bill of Rights retroactively for the benefit of a previously convicted defendant." *Brown v. Louisiana,* 447 U.S. 323, 327, 100 S.Ct. 2214, 2219, 65 L.Ed.2d 159 (1980). Since that decision, the Court has often considered the retroactivity implications of its decisions which expound new constitutional rules of criminal procedure. *Id.* Various principles emerge from the cases to guide my analysis in the present case.

"As a rule, judicial decisions apply 'retroactively.'" *Solem v. Stumes,* 465 U.S. 638, 642, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579 (1984) (*citation omitted*). However, "retroactive application is not compelled, constitutionally or otherwise." *Id.* The Court has recognized that "the interest of justice" and "the exigencies of the situation" may militate against the imposition of a new constitutional decision retroactively. *Id. See also, Linkletter,* 381 U.S. at 628, 85 S.Ct. at 1737. "It is clear that resolution of the question of retroactivity does not automatically turn on the particular

provision of the Constitution on which the new prescription is based." *Brown*, 447 U.S. at 327, 100 S.Ct. at 2219.[6] The Supreme Court has consistently applied a test to decide whether a new constitutional doctrine should be applied retroactively which contemplates the consideration of three criteria: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." *Stumes*, 465 U.S. at 643, 104 S.Ct. at 1341, *citing Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967).

At the same time, however, in a different line of cases, the Court has predicated its decision as to whether to apply a ruling retroactively on the procedural *status* of the case with respect to which the question arises. Recently, in *Shea v. Louisiana*, 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985), the Court in a 5–to–4 decision reviewed the retroactivity issue in this light. The Court was presented with the issue as to whether its ruling in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), would be applicable to a case pending on direct appeal in a state court at the time *Edwards* was decided.[7] The Court had recourse to two of its relatively recent decisions. In *United States v. Johnson*, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), the Court had held that one of its decisions concerning Fourth Amendment rights was to be applied retroactively to all convictions that were not yet final at the time the decision was rendered; in *Solem v. Stumes*, 465 U.S. 638, 650, 104 S.Ct. 1338, 1345, 79 L.Ed.2d 579 (1984), the Court had held that it would not retroactively apply one of its decisions in collateral

review of a final conviction. The Court recognized the primary difference between *Johnson* and *Stumes* as "the difference between a pending and undecided direct review of a judgment of conviction and a federal collateral attack upon a state conviction which has become final," *Shea*, 105 S.Ct. at 1069–70, and rendered its decision in *Shea* on the basis of this distinction.

The Court justified the distinction on "considerations of finality in the judicial process." *Id.* at 1070. While "one litigant already has taken his case through the primary system ... [t]he other has not. For the latter, the curtain of finality has not been drawn. Somewhere, the closing must come." *Id.* In *Shea*, the Court cited with approval Justice Powell's opinion concurring in the judgment in *Stumes:* "Because retroactive application of new rules of constitutional law generally does little to advance the purposes of collateral relief on habeas, it is particularly difficult in such cases to justify imposing upon the State the costs of collateral review. These are not insubstantial." *Stumes*, 465 U.S. at 653–54, 104 S.Ct. at 1347.

■ The principles enunciated in *Shea* lead to the conclusion that neither *Batson* nor *McCray* is applicable to the present case, which is a federal collateral attack upon a state conviction, and not a case pending on direct appeal.

The Court in *Batson* did not decide whether its ruling should be applied retroactively.[8] Justices White and O'Connor, in separate concurrences, and Chief Justice Burger, dissenting in an opinion in which Justice Rehnquist joined, explicitly stated that the Court's ruling should not be applied retroactively. 106 S.Ct. at 1726, 1731, 1741–42. The other members of the Court

---

**6.** " 'Each constitutional rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice, and the way in which these factors combine must inevitably vary with the dictate involved.' " *Brown*, 447 U.S. at 327, 100 S.Ct. at 2219, *citing Johnson v. New Jersey*, 384 U.S. 719, 728, 86 S.Ct. 1772, 1778, 16 L.Ed.2d 882 (1966).

**7.** The court held in *Edwards* that a criminal defendant's rights under the Fifth and Fourteenth Amendments were violated by the use of his confession obtained by police-instigated interrogation without counsel present after he requested an attorney.

**8.** There was no discussion of the retroactivity issue in *McCray*.

remained silent on the retroactivity issue. Chief Justice Burger in his dissent strongly urged non-retroactivity. He argued that because the *Batson* ruling clearly overruled a prior decision and drastically transformed standard practice, it virtually compelled non-retroactivity. He also pointed out that in the few states that have adopted judicially-created rules similar to those announced by the *Batson* majority, there has been a refusal to apply full retroactivity to those rules. *See People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748, 766 n. 31 (1978) (rule limited to voir dire proceedings conducted after present decision becomes final, except applied to defendants in case at bar); *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499, 518 n. 38 (1979) (rule applied only to defendants in cases at bar and to defendants in all cases now pending on direct appeal). *See* 106 S.Ct. at 1741–42.

Since *Batson*, the Supreme Court has granted *certiorari* in two cases to resolve the question whether *Batson* should be given retroactive effect in cases pending on direct appeal. *See Griffith v. Kentucky*, — U.S. —, 106 S.Ct. 2274, 90 L.Ed.2d 717 (1986), and *Brown v. U.S.*, — U.S. —, 106 S.Ct. 2275, 90 L.Ed.2d 718 (1986). More significantly, the Court held on June 30, 1986 that its "decision in *Batson* should not be applied retroactively on collateral review of convictions that became final before [its] opinion was announced." *Allen v. Hardy*, — U.S. —, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986). Citing *Linkletter*, the Court explained that "final" means "where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed before [the Court's] decision in *Batson v. Kentucky*." 106 S.Ct. 2880 n. 1.

*Allen v. Hardy* controls the instant case insofar as the application of *Batson* to these petitioners is concerned. Moreover,

on the basis of *Shea* and *Stumes*, as well as *Allen v. Hardy*, I believe the Second Circuit will not give retroactive effect to *McCray*.[9] Therefore, I deny petitioners' second claim for relief without reaching its merits.[10]

Because this area of law is unsettled, I will issue a certificate of probable cause to appeal.

SO ORDERED.

---

**9.** The Supreme Court has remanded *McCray* to the Second Circuit for further consideration in light of *Allen v. Hardy* and *Batson v. Kentucky*. *See* 106 S.Ct. at 3289.

**10.** At least two other courts reached the same conclusion before the Supreme Court ruled in *Allen v. Hardy*. *See Esquivel v. McCotter*, 791 F.2d 350 (5th Cir.1986); *State v. Jackson*, 343 S.E.2d 814 (N.C.1986).