**VOGEL, Dennis M.**

**v.**

**COMMONWEALTH OF PENNSYLVA-NIA, the Attorney General of the Commonwealth of Pennsylvania.**

**Appeal of Dennis M. VOGEL.**

**No. 85–5410.**

United States Court of Appeals, Third Circuit.

Argued Feb. 11, 1986.

Decided May 16, 1986.

Rehearing and Rehearing In Banc Denied June 16, 1986.

Alfred S. Pelaez (argued), Pittsburgh, Pa., for appellant.

LeRoy E. Zimmerman, Atty. Gen., Calvin R. Koons (argued), Deputy Atty. Gen., Andrew S. Gordon, Senior Deputy Atty. Gen., Allen C. Warshaw, Chief Deputy Atty. Gen., Chief, Litigation Section, Office of Atty. Gen., Harrisburg, Pa., for Atty. Gen.

Frederick D. Lingle (argued), Lock Haven, Pa., for Com. of Pa.

Before HIGGINBOTHAM and STAPLETON, Circuit Judges and TEITELBAUM, District Judge.*

## OPINION OF THE COURT

STAPLETON, Circuit Judge.

On August 1, 1962, appellant Dennis Vogel fatally shot two of his co-employees during the course of an armed robbery. Three successive juries found Vogel guilty of two counts of second degree murder and one count of robbery. At each of his trials, Vogel's sole defense was insanity.

The Supreme Court of Pennsylvania reversed appellant's first conviction in a 5–2 *per curiam* opinion that lacked a majority viewpoint. *Commonwealth v. Vogel,* 268 Pa. 1, 268 A.2d 89 (1970) [*Vogel I*]. Similarly, Vogel's second guilty verdict did not survive judicial scrutiny; the trial judge granted a defense motion for a new trial, finding the verdict against the weight of the evidence. The Supreme Court affirmed, *Commonwealth v. Vogel,* 458 Pa. 200, 321 A.2d 633 (1974) [*Vogel II*]. Appellant's third trial resulted in a conviction which was affirmed by the Pennsylvania Supreme Court. *Commonwealth v. Vogel,* 468 Pa. 438, 364 A.2d 274 (1976) [*Vogel III*].

Appellant filed a petition under the Pennsylvania Post Conviction Hearing Act, 42 Pa.C.S. § 9541 *et seq.,* arguing that his second and third trials offended the double jeopardy clause and that his counsel had been ineffective. The trial court agreed

with Vogel's second contention but rejected his double jeopardy argument. The Pennsylvania Supreme Court also rejected the double jeopardy claim, but in addition it reversed the trial court's grant of a new trial based on the ineffective assistance of counsel claim. *Commonwealth v. Vogel,* 501 Pa. 314, 461 A.2d 604 (1983) [*Vogel IV*]. The United States Supreme Court denied certiorari, 465 U.S. 1104, 104 S.Ct. 1603, 80 L.Ed.2d 133.

Finally, appellant filed a petition for habeas corpus in federal district court, the denial of which he now appeals. We have jurisdiction under 28 U.S.C. § 2253. Appellant once again contends that his second and third trials violated the double jeopardy clause. His argument relies on *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), which held that a finding of insufficiency of evidence during or after a criminal trial bars retrial. Appellant further contends that *Burks* should be retroactively applied.

### I

The right not to be twice put in jeopardy for the same offense is "fundamental to the American scheme of justice." *Benton v. Maryland,* 395 U.S. 784, 796, 89 S.Ct. 2056, 2063, 23 L.Ed.2d 707 (1969). The Double Jeopardy Clause reflects

[t]he underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, ... that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957).

* Honorable Hubert I. Teitelbaum, United States District Judge for the Western District of Pennsylvania, sitting by designation.

In *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), the Court held that the Double Jeopardy Clause precludes the second prosecution of a defendant whose guilty verdict is reversed by a reviewing court because of the insufficiency of the evidence.[1] Burks, accused of robbery, principally defended on the grounds of insanity. Before his case went to the jury, Burks submitted a motion for acquittal, which the district court denied. The jury then returned a guilty verdict. The Court of Appeals for the Sixth Circuit reversed, concluding that the prosecution's evidence fell short of proving sanity beyond a reasonable doubt. The Sixth Circuit then remanded the case to the district court for a "balancing of equities" to determine if a directed verdict of acquittal or a new trial should follow.

The Supreme Court found that such a remand was inappropriate. The appellate court's reversal meant that the trial court erred in not granting the motion for acquittal. But had the trial court itself initially recognized the insufficiency of the United States' proof of sanity, "a judgment of acquittal would have been entered and, of course, petitioner could not be retried for the same offense." 437 U.S. at 10–11, 98 S.Ct. at 2147, *citing Fong Foo v. United States*, 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962); *Kepner v. United States*, 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114 (1904).

The Double Jeopardy Clause, the Court continued, bars "a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." 437 U.S. at 11, 98 S.Ct. at 2147. The Court acknowledged that its prior holdings could "hardly be characterized as models of consistency and clarity." *Id.* at 9, 98 S.Ct. at 2146. To restore order, the Court revitalized the crucial but often ignored distinction between reversals based on insuffi-

cient evidence and reversals based on trial error.

Reversal because of trial error "implies nothing with respect to the guilt or innocence of the defendant," *id.*, nor does it suggest that the government has in any way failed to prove its case. Instead, "it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, *e.g.*, incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct." *Id.* Consequently, " 'it would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.' " *Id., quoting United States v. Tateo*, 377 U.S. 463, 466, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964).

The *Burks* Court thus made clear that retrial may follow a reversal based on trial error:

> The principle that [the Double Jeopardy Clause] does not preclude the Government's retrying a defendant whose conviction is set aside because of an *error in the proceedings* leading to conviction is a well-established part of our constitutional jurisprudence.

437 U.S. at 14, 98 S.Ct. at 2149 *quoting United States v. Tateo*, 377 U.S. 463, 465, 84 S.Ct. 1587, 1588, 12 L.Ed.2d 448 (1964) (emphasis supplied by *Burks*).

In contrast, reversal because of insufficient evidence

> means that the government's case was so lacking that it should not have been *submitted* to the jury. Since we necessarily afford absolute finality to a jury's *verdict* of acquittal—no matter how erroneous its decision—it is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty.

---

1. In *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), decided the same day as *Burks*, the Court held *Burks* applicable to state

proceedings. *See also Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) (Double Jeopardy Clause applicable to states).

437 U.S. at 16, 98 S.Ct. at 2150. Thus, such a reversal cannot be said to prejudice the prosecution, which "has been given one fair opportunity to offer whatever proof it could assemble." 437 U.S. at 16, 98 S.Ct. at 2150.

In *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982), the Court drew another double jeopardy distinction, this time between reversal based on insufficient evidence and reversal because the conviction was against the weight of the evidence. In a five to four vote, it held that the Double Jeopardy Clause does not preclude retrial after the latter.

The *Tibbs* majority confirmed the continuing viability of *United States v. Ball*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896), which, to the *Tibbs* Court, stands for the proposition "that a criminal defendant who successfully appeals a judgment against him 'may be retried anew ... for the same offence of which he had been convicted.'" 457 U.S. at 39–40, 102 S.Ct. at 2217, *quoting United States v. Ball*, 163 U.S. 662, 672, 16 S.Ct. 1192, 41 L.Ed. 300 (1896). The Court reasserted the principle "that the Double Jeopardy Clause 'imposes no limitations whatever upon the power to *retry* a defendant who has succeeded in getting his first conviction set aside,'" 457 U.S. at 40, 102 S.Ct. at 2217, *quoting North Carolina v. Pearce*, 395 U.S. 711, 720, 89 S.Ct. 2072, 2078, 23 L.Ed.2d 656 (1969). Two considerations supported this principle: first, the unacceptable societal cost of immunizing from punishment every defendant whose conviction was tainted by reversible error, and second, the Court's recognition that "retrial after reversal of a conviction is not the type of governmental oppression targeted by the Double Jeopardy Clause." 457 U.S. at 40, 102 S.Ct. at 2217.

*Burks* and *Greene* represented a narrow exception to this general rule. Two policies informed the *Burks* exception:

First, the Double Jeopardy Clause attaches special weight to judgments of acquittal. A verdict of not guilty, whether rendered by the jury or directed by the trial judge, absolutely shields the defendant from retrial. *A reversal based on the insufficiency of the evidence has the same effect because it means that no rational factfinder could have voted to convict the defendant.*

Second, *Burks* and *Greene* implement the principle that "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks, supra* [437 U.S.], at 11 [98 S.Ct. 2147]. This prohibition, lying at the core of the Clause's protections, prevents the State from honing its trial strategies and perfecting its evidence through successive attempts at conviction. Repeated prosecutorial sallies would unfairly burden the defendant and create a risk of conviction through sheer governmental perseverance.... For this reason, when a reversal rests upon the ground that the prosecution has failed to produce sufficient evidence to prove its case, the Double Jeopardy Clause bars the prosecutor from making a second attempt at conviction.

457 U.S. at 41–42, 102 S.Ct. at 2218 (citations omitted) (emphasis added).

These policies the Court found less persuasive in the context of reversals where the verdict was against the weight of the evidence. Such a reversal does not imply that acquittal necessarily was the proper verdict. Rather, "the appellate court sits as a 'thirteenth juror,'" and its disagreement with the jury's resolution of the evidence "no more signifies acquittal than does a disagreement among the jurors themselves." *Id.* at 42, 102 S.Ct. at 2218. Just as retrial is not barred because the first trial ended in a deadlocked jury, so is retrial not barred where the appellate court disagrees with the jury's weighing of the evidence.

The Court continued,

A reversal based on the weight of the evidence, moreover, can occur only after the State both has presented sufficient

evidence to support conviction and has persuaded the jury to convict.

The reversal simply affords the defendant a second opportunity to seek a favorable judgment. An appellate court's decision to give the defendant this second chance does not create "an unacceptably high risk that the Government, with its superior resources, [will] wear down [the] defendant" and obtain conviction solely through its persistence.

*Id.* at 42–43, 102 S.Ct. at 2218–19, *quoting United States v. DiFrancesco,* 449 U.S. 117, 130, 101 S.Ct. 426, 433, 66 L.Ed.2d 328 (1980). Thus, the "Double Jeopardy Clause does not require society to pay the high price of freeing every defendant ... who persuades an appellate panel to overturn an error-free conviction and give him a second chance at acquittal." 457 U.S. at 44, 102 S.Ct. at 2219.

## II

In *Vogel IV,* the Supreme Court of Pennsylvania found that appellant, in securing reversals of his first two convictions, "had the benefit of a metamorphosis in the law" of Pennsylvania and, accordingly, that double jeopardy did not bar his second or third trial. The court held:

> in both *Vogel I* and *Vogel II,* it is without question that the prosecution did not fail because of the inadequacy of its evidence to prove Vogel's commission of the crimes charged. In each instance the jury convicted. The judgments of sentence were disturbed only because of an after the fact determination that the "judicial process [was] defective in some fundamental respect...." *Burks* ..., *supra* 437 U.S. at 15, 98 S.Ct. at 2149.... The adjustment of the judicial process, which was the basis for overturning the verdicts of guilt in the first and second trials, was properly achieved in providing Mr. Vogel with a further opportunity "in obtaining a fair readjudication of his guilt free from error" and at the same time accommodated society's

"valid concern for insuring that the guilty are punished." *Id.*

\* \* \* \* \* \*

This case provides a vivid example of an accused being given the benefits of the refinements in our process which he clearly would not have been entitled to nor could he reasonably have expected on the day he committed these heinous acts. The absurdity of an application of double jeopardy considerations, in a situation where the defendant's rights have been scrupulously accorded, is evident. Moreover, we may not ignore the obligation to the citizenry of this Commonwealth to assure that those who violate our laws will be held criminally responsible for the pain and suffering resulting from their behavior.

461 A.2d at 611.

The district court took the same approach. It found, with regard to appellant's first two convictions:

> in each case petitioner's conviction was set aside because of the evolving state of Pennsylvania law concerning the proper allocation of the burdens of proof and persuasion when an insanity defense is raised. As such, the Commonwealth simply was following the newly established guidelines laid down by the court. No "second bite of the apple" was provided by enabling the Commonwealth to conform its evidence to the new standards....

A–23.

Thus, the Pennsylvania Supreme Court and the court below distinguished between *Burks* and the case *sub judice* because in *Burks,* the evidence was insufficient to meet the legal standard in effect at the time of trial, while in each of appellant's trials, the evidence was insufficient only under new standards that were promulgated on review. According to this view, *Burks* should not apply when the evidence at trial, although insufficient under the legal standard newly adopted by the reviewing court, was sufficient under the standards applicable at trial.

We do not find it necessary to determine whether *Burks* should apply when the insufficiency of the evidence arises, as it did in *Vogel I,* solely because a new legal standard was announced by the reviewing court. Instead, we find that the state's evidence in *Vogel II* was insufficient under the legal standard applicable at the time of trial. Consequently, the Commonwealth's case should never have been submitted to the jury, and *Burks,* if retroactive,[2] shielded appellant from further prosecution.

### III

Some acquaintance with the pre-*Vogel* law of insanity in Pennsylvania is necessary to an understanding of this case. Pennsylvania has long adhered to the *M'Naghten* definition of insanity, which terms a defendant insane if he "did not understand the nature and quality of his act or the difference between right and wrong" at the time of his offense. *Commonwealth v. Heller,* 369 Pa. 457, 87 A.2d 287, 289 (1952). *See Queen v. M'Naghten,* 10 Cl. & Fin. 200, 8 Eng.Rep. 718 (1843). *See also Commonwealth v. Mosler,* 4 Pa. 264 (1846) (adopting the *M'Naghten* rule); *Commonwealth v. Woodhouse,* 401 Pa. 242, 164 A.2d 98 (1960) (reaffirming adherence to *M'Naghten* ).

Illustrative of the law of insanity prior to *Vogel I* is *Commonwealth v. Carluccetti,* 369 Pa. 190, 85 A.2d 391 (1952). Carluccetti's insanity defense relied on the extensive testimony of a psychiatrist, while the Commonwealth introduced fifteen lay witnesses in rebuttal. On appeal, the defendant challenged the sufficiency of the evidence. The court replied:

As sanity is the legally recognized normal condition of human beings, its existence in any given instance is presumed. Consequently, the burden of proving insanity as a defense to a criminal charge is upon the one asserting it. It is incumbent upon him to establish the alleged defective mental condition by a fair preponderance of the evidence. *Commonwealth v. Iacobino,* 319 Pa. 65, 68, 178 A.

823, 825 [ (1935) ]. Throughout, the issue remains one of fact for the jury to determine.... "The presumption of sanity, which is the normal condition of man, 'holds good, and is the full equivalent of express proof, until it is successfully rebutted.' ...".... "Where mental capacity at the time of the act is an issue, the Commonwealth is aided by the presumption of sanity; it is not required to prove affirmatively mental capacity to commit the act."

The evidence amply supports the jury's conclusion that the defendant was sane at the time of his commission of the homicides. The proof which the defendant offered as to his mental condition failed to overcome the presumption of sanity. The testimony of his expert ... was unconvincing to the jury.

*Carluccetti,* 85 A.2d at 395, *quoting Commonwealth v. Iacobino,* 319 Pa. 65, 178 A. 823, 825, 826 (1935) (*quoting Commonwealth v. Gerade,* 145 Pa. 289, 22 A. 464, 465 (1891). *See also Commonwealth v. Gerade,* 145 Pa. 289, 22 A.464, 465 (1891); *Commonwealth v. Updegrove,* 413 Pa. 599, 198 A.2d 534, 536 (1964).

Although the correct interpretation of these cases is disputed by the parties, we are of the view that before *Vogel,* the Commonwealth was entitled to get to the jury by relying solely on the presumption of sanity. Since the defendant bore the burden of proving insanity by a preponderance of the evidence, if the jury disbelieved defendant's evidence and believed the Commonwealth's evidence on the elements of the offense beyond a reasonable doubt, a conviction was legally permissible. This is presumably what happened in appellant's original trial. With this understanding of the pre-*Vogel* case law in mind, we turn to the *Vogel* cases themselves.

### IV

#### *Vogel I*

Appellant concedes that at his first trial, the Commonwealth introduced sufficient

---

**2.** See Section V, *infra.*

evidence during its case in chief so that, had the case been submitted to the jury before the defense presented its evidence, conviction would have been warranted. Appellant, however, did come forward with strong evidence in support of his affirmative defense of insanity. This evidence included the circumstances of his military discharge and the testimony of both lay and expert witnesses. The lay testimony Justice Jones summarized as follows:

> from his early teens, Vogel displayed erratic and often bizarre conduct. Illustrative thereof is the testimony of Vogel's former wife that she interrupted a war game Vogel was playing, with M & M candies representing soldiers. "He liked the green ones, I don't know why, but he had the greens on one side and the orange on the other side, and he would make all of the other colors more like troops to help the other side. Q. You mean like reserves or something like that? A. Yes, and so just for the fun I reached down and I grabbed an M & M and I popped it in my mouth and he got furious at me because it wasn't dead yet. Q. The M & M wasn't dead yet? A. Yes, the M & M wasn't dead yet. It was not a soldier that was killed, in other words."

*Vogel I*, 268 A.2d at 92 (Justice Jones concurring). Three well-qualified psychiatrists took the stand on appellant's behalf. They each unequivocally testified to appellant's insanity at the time of the offenses.

The Commonwealth, apparently relying on the presumption in favor of sanity, presented no evidence to rebut or impeach the testimony offered by the defense. The jury then returned a guilty verdict.

The Pennsylvania Supreme Court reversed in a *per curiam* opinion that stated,

in its entirety, "Judgments of sentence reversed and new trial granted." *Vogel I*, 268 A.2d 90, 90. Justice Roberts and Justice Pomeroy concurred separately, and Justice Jones wrote a third concurring opinion joined in by Justice O'Brien. Without explanation, Justice Cohen supplied the fifth vote for reversal. Justice Bell and Justice Eagen dissented.

The majority split on the question of the placement of the burden of proof of insanity. Justice Roberts and Justice Pomeroy each argued that the Commonwealth should bear the burden of proving appellant's sanity beyond a reasonable doubt. Justice Pomeroy contended that the Commonwealth could meet its burden by producing "any competent evidence, including circumstantial evidence," but

> in the present case the Commonwealth produced no direct affirmative evidence to prove that the defendant was legally sane at the time of the murder; neither was there any circumstantial evidence which tended to prove legal sanity, as distinguished from intent or design to carry out the robbery in the course of which the homicide occurred.

289 A.2d at 104. Justice Pomeroy therefore found that "[o]n the face of the record before us, the Commonwealth did not meet [its] burden." While he did not expressly so state, it is apparent that Justice Roberts subscribed to the same conclusion.

Justice Jones and Justice O'Brien agreed that the conviction could not stand, not because the burden of persuasion had been assigned erroneously to the defendant, but because they concluded that the Commonwealth needed to introduce "some evidence" of sanity once the defendant properly raised the issue.[3] 268 A.2d at 95.

> An individual may intentionally kill someone, with malice aforethought, but be incapable of distinguishing right from wrong in so doing. Under such circumstances, the elements of murder would be met ..., but the individual's legal insanity would properly necessitate a verdict of not guilty by reason of insanity. This is the type of situation which is demonstrated on the face of the instant record.

---

**3.** Appellant contends that "at all three of Dennis Vogel's trials it was incumbent upon the state to introduce *some* evidence of his sanity, since a person lacking sanity could not form the requisite intent to commit the crimes of which he was charged." Appellant's Brief at 13. Appellant thus contends that Justice Jones found the evidence legally insufficient to prove criminal intent. We read his opinion otherwise.

As Justice Jones noted,

The Commonwealth's evidence, they found, "failed to rebut the defendant's proof of legal insanity, but merely established the circumstances of the crime and the events leading to the apprehension of the defendant. Accordingly, the verdicts are not supported by the evidence and must be set aside." *Id.* In subsequent cases the Commonwealth would be required to come forward with

> *some* evidence to substantiate the conclusion that he was legally sane—*i.e.,* that he could differentiate between right and wrong.... If the rule did not include this proviso, then, as in the case at bar, a jury might return a verdict totally without evidentiary support of record.

268 A.2d at 95.

In *Vogel I,* a majority of the justices reaffirmed the placement of the burden of proof of insanity on the defendant. At the same time, a majority of justices, albeit a different majority, held that the Commonwealth would no longer be able to get to the jury relying exclusively on the presumption of sanity. Henceforth it would have to introduce, at a minimum, "some evidence" of sanity once the issue was properly raised.[4]

### Vogel II

 At appellant's second trial, the Commonwealth responded to *Vogel I* by offering two lay witnesses who testified to appellant's sanity. One lay witness, Mrs. Dickey, was appellant's work supervisor for the four months immediately prior to the offenses. The substance of her testimony on the subject of appellant's sanity was as follows:

Q. Did you have a chance to observe his conduct and behavior?

A. Yes.

Q. Do you have an opinion as to his behavior or conduct?

A. Yes. Dennis always seemed, I would say, to do his work. He did what he was told; he seemed to get along with the girls in the store and myself. I know different times we might have had arguments and things but he never held anything against you, or at any time he would not hold a grudge against you and not talk to you.

\* \* \* \* \* \*

Q. Mrs. Dickey you testified that you had an opportunity to observe Dennis Vogel over these few months, did you observe anything in his conduct or behavior that indicated an unsound mind?

A. No, I did not.

Q. Did you observe anything in his behavior that he did not know right from wrong?

A. No.

A166. The second witness for the Commonwealth was the state policeman in charge of investigation of Vogel's case. He observed appellant for ten days immediately following the arrest. The Commonwealth relies on the following colloquy:

Q. Was Vogel able to communicate with you?

A. We talked about other things than the crime.

---

*Id.* 268 A.2d at 94 (citations omitted). This excerpt reflects Justice Jones' conclusion that the Commonwealth sufficiently proved criminal intent. He just as clearly rejects "the premise that sanity is necessarily an element of every crime." *Id. See also United States ex rel Tate v. Powell,* 325 F.Supp. 333 (E.D.Pa.1971).

**4.** Appellant contends this view of the presumption predated *Vogel* and, as a result, the Commonwealth failed to introduce legally sufficient evidence under standards applicable at the time of his first trial. Appellant points to *Commonwealth v. Pomponi,* 447 Pa. 154, 284 A.2d 708, 711–12 (1971):

> The justices in the majority in *Vogel* [I] relied on long-standing rules of evidence in holding that a verdict may not be based solely on a presumption where there is evidence which credibly contradicts the presumption. In *Vogel* the Commonwealth, not the defendant, sought to change the law.

*Pomponi,* 284 A.2d at 711–12.
We think that the authoritative interpretation of *Vogel I* is that found in *Vogel IV.* There the Supreme Court determined that the requirement of "some evidence" was an innovation of *Vogel I,* and that *Vogel I* reversed appellant's first conviction because of this "adjustment in the judicial process." *Vogel IV,* 461 A.2d at 611.

Q. Was he able to order his dinner and lunch?

A. Yes, he ordered from the menu.

Q. And you saw him several days after that?

A. Approximately ten days.

Q. Did you notice anything about his conduct or behavior that would indicate an unsound mind?

A. No sir, he was a quiet individual; he never was radical, he was real quiet.

*Id.* After the jury returned a verdict of guilty, the trial judge vacated the jury's verdict and ordered retrial.

The trial judge observed that the majority of the Justices in *Vogel I*

agreed that the issue of insanity having been properly raised, the Commonwealth therefore was no longer aided by the presumption of sanity, and that it then had a "certain responsibility to produce evidence to show sanity." ... It is now settled that the defendant has the burden of showing insanity by a preponderance of the evidence.... The defendant having produced such evidence, the Commonwealth then has the burden of going forward with evidence to prove sanity.

A163 (citations omitted). He further pointed out that, although the majority in *Vogel I* concluded that the Commonwealth had failed to show that appellant could distinguish right from wrong, the Commonwealth had attempted to rectify this failure only through the testimony of its two lay witnesses. The trial judge expressed "grave doubts that this evidence is legally sufficient to sustain the conclusion of sanity." Nevertheless, he did not so rule. Instead, assuming the legal sufficiency of the evidence, the court found the verdict to be against the weight of the evidence and granted a new trial.

On appeal, the Supreme Court approved this finding as being within the trial court's discretion and went on to note that, between appellant's trial and his appeal, the Supreme Court had shifted the burden of persuasion to the Commonwealth on the insanity issue. *Vogel II,* 458 Pa. 200, 321 A.2d 633 (1974). *See Commonwealth v.*

*Demmitt,* 456 Pa. 475, 321 A.2d 627 (Pa. 1974); *Commonwealth v. Rose,* 457 Pa. 380, 321 A.2d 880 (Pa.1974).

The court in *Vogel IV* found it sufficient to note that appellant's second conviction was overturned because it was against the weight of the evidence and because the government's evidence was insufficient to prove sanity beyond a reasonable doubt. Like the trial court, it did not address the issue of whether the evidence was insufficient under the standards set in *Vogel I.*

We have previously recognized that when a defendant raises an insufficiency of evidence contention that the trial court finds unnecessary to address, a court subsequently presented with a double jeopardy argument must address and resolve that issue. *See United States v. United States Gypsum Co.,* 600 F.2d 414 (3d Cir.) *cert. denied,* 444 U.S. 884, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979); *see also United States v. Sneed,* 705 F.2d 745, 748 (5th Cir.1983); *United States v. Marolda,* 648 F.2d 623 (9th Cir.1981). We believe *Burks* requires as much when the original proceedings were in the state courts. A defendant's double jeopardy right should not be affected by the fact that a trial judge chooses not to answer the difficult but, under *Burks,* relevant question. Assuming that new law at the appellate level should not expand a defendant's double jeopardy rights, neither should a court be able to diminish those rights by failing to address the sufficiency of the evidence under the legal standard in effect at trial.

As the trial court noted, the Pennsylvania Supreme Court in *Vogel I* did not define precisely how much evidence was "some evidence." Nor did it invoke a doctrinal framework which dictates a definition. We agree with the trial judge, however, that the requirement of "some evidence" at least required the Commonwealth to produce such evidence " 'as a reasonable mind might accept as adequate to support a conclusion.' " A164, *quoting Huerbin v. D.L. Clark Co.,* 140 Pa.Super. 406, 14 A.2d 175 (Pa.Super.1940).

We are confident that, had the issue been addressed by the Pennsylvania courts, the meager evidence of sanity relied upon by the Commonwealth at the second trial would have been found insufficient to constitute "such evidence as a reasonable mind might accept as adequate to support a conclusion" of sanity. The police officer offered *no* probative evidence that Vogel could distinguish right from wrong. All that Vogel's supervisor of four months, Mrs. Dickey, could say was that she was aware of no evidence indicating he was unable to make such a distinction. In the absence of some evidence to indicate that she participated in a situation that revealed Vogel's capacity to tell-right from wrong, we conclude that no reasonable person would accept Mrs. Dickey's testimony as adequate to support an affirmative conclusion of sanity. Thus, in our view, the government's evidence at Vogel's second trial was legally insufficient to sustain the burden imposed on the Commonwealth by *Vogel I.*[5]

It follows that the trial judge should not have permitted the Commonwealth's case to get to the jury. In such a situation, as *Burks* makes clear, the decision must be afforded the same "absolute finality" as that afforded a jury's verdict of acquittal. Thus, retrial of appellant after *Vogel II* was impermissible.

### V

▮ The Commonwealth contends that even if one of appellant's convictions was reversed because of insufficient evidence, *Burks* should not be retroactively applied. It contends that the test of *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), precludes retroactive application of the *Burks* rule. On the other hand, appellant, relying on *Robinson v. Neil,* 409 U.S. 505, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973), argues that *Burks* is fully retroactive. We agree with appellant.

In *Linkletter,* the Court addressed the retroactivity of *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), which held the exclusionary rule applicable to the states. It found the benefits of *Mapp* were available only to defendants whose convictions were not yet final at the time that case was decided. The Court fashioned a three part test, focusing on the purpose of the new rule, the reliance placed on the old rule, and the effect on the administration of justice of retroactive application of the new rule. The Court decided that the purpose of *Mapp's* exclusionary rule—to deter police misconduct—would be little served by retrospective application since the offensive conduct had already taken place. As to the second and third factors, the Court found that the government had relied on the prior law, and that retrospective application would tax the administration of justice to the "utmost" since hearings to determine if the exclusionary rule was violated and subsequent new trials would occur long after the evidence had become stale. Finally, the Court noted that "in each of the three areas in which we have applied our rule retrospectively, the principle that we applied went to the fairness of the trial—the very integrity of the fact-finding process." *Id.* at 639, 85 S.Ct. at 1743.

In *Desist v. United States,* 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), the Court gave only prospective effect to *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), another Fourth Amendment holding. The applicable legal standard was reaffirmed:

"The criteria guiding resolution of the question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforce-

---

5. The Commonwealth contends that *Tibbs,* not *Burks,* governs *Vogel II,* because the jury's verdict was against the weight of the evidence rather than legally insufficient. As we have made clear, however, the Commonwealth came forward with no probative evidence that "a reasonable mind might accept as adequate to support a conclusion of sanity." Thus, under the "some evidence" rule established by *Vogel I,* the Commonwealth's case should never have been submitted to the jury. As *Tibbs* recognized, such a directed verdict "absolutely shields the defendant from retrial." *Tibbs,* 457 U.S. at 41, 102 S.Ct. at 2218.

ment authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."

394 U.S. at 249, 89 S.Ct. at 1033 (quoting *Stovall v. Denno,* 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967).

The Court found the first of these criteria "foremost." The purpose of the exclusionary rule—to deter illegal police action—was *not* related to the reliability of the conviction. The Court also "noted ... [that it had] relied heavily on the factors of the extent of reliance and consequent burden on the administration of justice only when the purpose of the rule in question did not clearly favor either retroactivity or prospectivity." 394 U.S. at 251, 89 S.Ct. at 1035. This de-emphasis of the reliance factor was confirmed in *Brown v. Louisiana,* 447 U.S. 323, 328, 100 S.Ct. 2214, 65 L.Ed.2d 159 (1980), which found reliance need not be reached when the purpose of the rule clearly favors prospectivity or retroactivity.

The Court took a significantly different approach to retroactivity in *Robinson v. Neil. Robinson* held fully retroactive the ruling of *Waller v. Florida,* 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970), which held that the double jeopardy clause bars two prosecutions—one state and one municipal—for the same offense. *Robinson* explicitly limited the applicability of the *Linkletter* test. The Court declared:

> [We do not] believe that this case readily lends itself to the analysis established in *Linkletter.* Certainly, there is nothing in *Linkletter* or those cases following it to indicate that all rules and constitutional interpretations arising under the first eight Amendments must be subjected to the analysis there enunciated.

409 U.S. at 507, 93 S.Ct. at 877. To the contrary, the Court noted that *Linkletter* and other cases dealt only with the constitutionality of the use of evidence or of a particular mode of trial.

*Robinson* warned against treating procedural and non-procedural guarantees alike for retroactivity purposes. For example,

although *Linkletter* indicates "that only those procedural rules affecting 'the very integrity of the fact finding process' would be given retrospective effect," some non-procedural guarantees unrelated to the integrity of that process have been applied retrospectively. In particular, the *Robinson* Court found that the double jeopardy prohibition is "not readily susceptible of analysis under the *Linkletter* line of cases." *Id.* at 508, 93 S.Ct. at 878. The Court had, in fact, already applied *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) (double jeopardy clause applicable to states), retroactively without examination of the *Linkletter* factors.

The *Robinson* Court continued.

> The guarantee against double jeopardy is significantly different from procedural guarantees held in the *Linkletter* line of cases to have prospective effect only. While this guarantee, like the others, is a constitutional right of the criminal defendant, its practical result is to prevent a trial from taking place at all, rather than to prescribe procedural rules that govern the conduct of a trial. A number of the constitutional rules applied prospectively only under the *Linkletter* cases were found not to affect the basic fairness of the earlier trial, but to have been directed instead to collateral purposes such as the deterrence of unlawful police conduct.... In *Waller,* however, the Court's ruling was squarely directed to the prevention of the second trial's taking place at all, even though it might have been conducted with a scrupulous regard for all of the constitutional procedural rights of the defendant.
>
> We would not suggest that the distinction that we draw is an ironclad one that will invariably result in the easy classification of cases in one category or the other. The element of reliance embodied in the *Linkletter* analysis will not be wholly absent in the case of constitutional decisions not related to trial procedure....

*Id.* 409 U.S. at 509, 93 S.Ct. at 878.

The Court acknowledged that retrospective application of *Waller* would prejudice

the state, since the state may have allowed the municipal prosecution to precede its own in reliance on the dual sovereignty analogy. However, the Court found that the *Waller* decision did not represent a marked break from earlier law, and that the reliance was not entirely justifiable. The Court concluded, "We intimate no view as to what weight should be accorded to reliance by the State that was justifiable under the *Linkletter* test in determining retroactivity of a non-procedural constitutional decision such as *Waller*." *Id.* at 510–11, 93 S.Ct. at 879.

In *United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), the Court examined the relationship of the *Robinson* decision to the *Linkletter* analysis. The Court found that "in three narrow categories of cases, the answer to the retroactivity question has been effectively determined, not by application of the [*Linkletter*] ... factors, but rather, through application of a threshold test." 457 U.S. at 548, 102 S.Ct. at 2586. The double jeopardy decisions fell into the third of these categories:

the Court has recognized full retroactivity as a necessary adjunct to a ruling that a trial court lacked authority to convict or punish a criminal defendant in the first place. The Court has invalidated inconsistent prior judgments where its reading of a particular constitutional guarantee immunizes a defendant's conduct from punishment ... or serves "to prevent [his] trial from taking place at all, rather than to prescribe procedural rules that govern the conduct of [that] trial," *Robinson v. Neil,* 409 U.S., at 509 [93 S.Ct. at 878] (double jeopardy). In such cases, the Court has relied less on the technique of retroactive application than on the notion that the prior inconsistent judgments or sentences were void *ab initio.* See, *e.g.,* ... *Ashe v. Swenson,* 397 U.S. 436, 437 n. 1 [90 S.Ct. 1189, 1191 n. 1, 25 L.Ed.2d 469] (1970) (retroactive application of double jeopardy ruling in

*Benton v. Maryland,* 395 U.S. 784 [89 S.Ct. 2056, 23 L.Ed.2d 707] (1969)).

457 U.S. at 550, 102 S.Ct. at 2587.

We find that *Robinson* and *Johnson* compel the conclusion that *Burks* must be applied retrospectively. We note, as has the Fifth Circuit, that *Robinson* failed to "expound at any great length on whether rulings implicating the double jeopardy clause should always be retroactive and, if not, under what circumstances they should be retroactive." *Bullard v. Estelle,* 665 F.2d 1347, 1364 (5th Cir. 1982), *vacated and remanded on other grounds,* 459 U.S. 1139, 103 S.Ct. 776, 74 L.Ed.2d 987 (1983). Nevertheless, we are convinced that the principles set forth in *Robinson* govern this case.

We find support for our conclusion in the unanimity of decision reached by the other courts that have faced this issue. Each has determined that *Burks* is fully retroactive. In *Bullard,* the Fifth Circuit persuasively explained.

As in all double jeopardy cases, [the decision in *Burks* is] ... squarely directed to the prevention of second trials and the concomitant conviction ... which may follow from those second trials.... [*Burks* is] markedly different from decisions, such as *Linkletter,* setting forth procedural rules which speak only to the manner of how trials are conducted. There the question is whether second trials are necessary to insure the protection of defendants convicted under the old unconstitutional rule and thus whether the rule must be applied retroactively. Rather, *Burks* ... seek[s] completely to prevent second trials and must be given retroactive effect to insure a defendant's right to be free from double jeopardy.

*Bullard v. Estelle,* 665 F.2d at 1364–65.

The *Bullard* court, after finding that "the emphasis on reliance is a questionable consideration in this non-procedural area," *id.* at 1364 n. 33, pointed out that at the time of trial state law forbade retrial in the circumstances of the case. Therefore the state could not justifiably claim reliance.

Nor was the court impressed by the state's claim of prejudice:

> where the State has had one complete, unencumbered chance to prove the facts necessary for [conviction] ..., "the prosecutor cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble."

*Id.* at 1366 (*quoting Burks,* 437 U.S. at 16, 98 S.Ct. at 2149).

Thus, *Bullard* recognized the right of a defendant to be free of the *consequences* of an impermissible conviction. *See also United States v. Bodey,* 607 F.2d 265 (9th Cir. 1979); *Ex Parte Reynolds,* 588 S.W.2d 900 (Tex.Crim.App.1979). We agree that the purpose of the *Burks* rule—to foreclose conviction and consequences of conviction after a trial where the state should not have gotten to the jury—clearly favors retroactivity. Therefore, we find that the holding of *Burks* is fully retroactive.

### VI

In light of the foregoing, we reverse the judgment below and direct that the district court take whatever action is necessary to relieve appellant of all consequences of his detention.[6]

---

**6.** The Commonwealth contends, relying on *Solem v. Stumes,* 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984), and *Shea v. Louisiana,* —— U.S. ——, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985), that *Robinson* does not govern this case. In *Solem v. Stumes,* the Court refused to apply retrospectively *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), a Fifth Amendment decision which prohibits police from interrogating a suspect after the suspect invokes his right to counsel. The Court noted that, "as a rule, judicial decisions apply 'retroactively,'" 465 U.S. at 642, 104 S.Ct. at 1341,

quoting *Robinson v. Weil,* but affirmed that *Linkletter* had established a test for the basic principles of retroactivity that might lead to prospective application only.

*Shea v. Louisiana* held that *Edwards* was applicable to cases on direct review when *Edwards* was handed down. Thus, *Shea* and *Solem* together define nonretroactivity under the *Linkletter* test as beginning after direct review is exhausted. We find nothing in these cases, however, which suggests that *Robinson* does not govern appellant's double jeopardy claim.